

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| IN RE: | C/A No. 04-14378-W |
|---|---|
| Craig Lewis Bishop, | **ORDER** |
| Debtor. | Chapter 12 |

THIS MATTER comes before the Court upon the 11 U.S.C. § 506(a) motion to value filed by Craig Lewis Bishop (the "Debtor") regarding security consisting of 33.71 acres, more particularly described herein, and objections to the motion filed by Farm Service Agency ("FSA") and AgSouth Farm Credit ("AgSouth"). Following consideration of the pleadings, the evidence presented, the arguments of counsel, and the stipulations filed by the parties, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, which is applicable to bankruptcy proceedings under Federal Rule of Bankruptcy Procedure 7052.[1]

## FINDINGS OF FACT

1. Debtor filed a petition for relief under Chapter 12 of the United States Bankruptcy Code on December 3, 2004. Debtor is the record owner of the following real estate (hereinafter referred to as the "Property"):

> All that certain piece, parcel or tract of land measuring and containing Thirty- three and seventy-one One-hundredths (33.71) acres, more or less, situate lying and being in the Bend of Four Holes section, School District 4, County of Dorchester, State of South Carolina, and being bounded now or formerly as follows to wit: On the North by lands of Robert N. Bell; on the East by lands of Richard Bishop; on the South by lands of Richard Bishop and lands of Herbert Bishop; and on the West by lands of Hamet M. Bishop.
>
> The above described property is more fully delineated on a plat entitled "Plat showing

---

[1] The Court notes that, to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and, to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

property of Craig L. Bishop located Bend of Four Holes Dorchester County, South Carolina DATE: September 9, 1997" by Richard J. Rhode, S.C.R.L.S. number 11366, which plat is recorded in the Office of the R.M.C. for Dorchester County in plat cabinet J slide 30. ALSO a non-exclusive right of way and ingress-egress easement leading from a county road known as the Cantley Rd. to the property above described, as shown and delineated on said plat.

The above described property is the identical property conveyed to Craig Lewis Bishop by deed recorded in Deed Book 326 at page 4, and by deed recorded in Record Book 1292 page 309 in the Office of the R.M.C. for Dorchester County.

2. AgSouth is the successor in interest to Edisto Farm Credit. On October 1, 1997, Edisto Farm Credit recorded a mortgage on the Property in Book 1832 at page 325 in the Office of the Register of Deeds for Dorchester County, South Carolina. It is undisputed that the amount of the AgSouth Farm Credit debt as of December 3, 2004 was $176,689.30.

3. The United States Department of Agriculture, acting through the FSA, recorded a mortgage on the real estate on May 2, 2002, in the Office of the Register of Deeds for Dorchester County, South Carolina in Book 3074 at Page 321. It is undisputed that the amount of the FSA debt as of December 3, 2004 was $113,527.52. The interest or lien of the FSA mortgage is junior and subsequent in priority to the AgSouth mortgage.

4. Improvements on the real estate consist of two poultry houses, a metal shed with a concrete floor, a second metal shed with a dirt floor, eight grain bins, and a frame hog barn. A double wide mobile home, owned by Debtor, is located on the Property. Neither FSA nor AgSouth claim a lien on the mobile home.

5. Previously, Debtor operated a breeder poultry operation on the property. Gold Kist, Inc. ("Gold Kist") provided Debtor flocks for growing in its hatching egg program.

6. A poultry integrator is an entity that processes poultry for commercial sale. Gold Kist is the

only poultry integrator in Debtor's geographic area. By letter dated October 21, 2003, Gold Kist notified Debtor that it would not furnish any new flocks to him. Debtor's poultry houses have been vacant since May 29, 2004.

7. The field operations manager for Gold Kist testified that Gold Kist was unwilling to place flocks with Debtor for any purpose. However, if the Property were sold to another party and the Property converted to a broiler operation, Gold Kist would place flocks with the new owner.

8. Both AgSouth and Debtor presented testimony on the value of the Property.[2] Each presented two diverging appraisals. Debtor's proposed value was based upon his appraiser's determination that the Property should be valued as rural residential. He placed a value of $2,300.00 per acre, for a total value of $77,533.00 for the Property. Debtor's appraiser did not place any value on the existing structural improvements, inasmuch as, in his opinion, the improvements were more of a detriment to the value of the Property.

9. Debtor intends to maintain ownership of the Property, and to use the Property as his residence. He does not intend to resume poultry operations.

10. AgSouth's proposed value was based upon converting the Property to a broiler facility, contending that use to be the Property's highest and best use. AgSouth presented a value of $77,500.00 for the Property, and a value of $147,500.00 on the improvements. The appraisal noted, but does not appear to deduct from the value, the costs to convert the Property to a broiler facility, including alterations to the chicken houses and upgrading of equipment. AgSouth's appraiser testified that costs to convert the houses could exceed $100,000.00, and the appraisal indicated that

---

[2] FSA did not present its own expert testimony, instead relying upon the appraisal and testimony of AgSouth's appraiser.

3

the value was contingent upon two (2) breeder houses being converted to broiler houses and a contract to be received from Gold Kist in order to continue operations.

11. Debtor proposes to fund his Chapter 12 Plan in part by farming approximately fifty (50) acres of corn and fifty (50) acres of soybeans per year. Sixteen (16) tillable acres are located on the Property.[3]

12. The parties agree that the Property, excluding improvements, has a value of $77,500.00.

13. The parties presented only the two appraisals to the Court: one for the Property to be valued as rural residential (Debtor's) and one for the Property to be valued as a broiler facility following conversion (AgSouth/FSA). Both appraisals' final values are based on a sales comparison approach for each of their proposed uses.[4] AgSouth did not present a value based upon Debtor's proposed use of the Property, and no other values other than those provided in the appraisals were presented to the Court.

## CONCLUSIONS OF LAW

The issue to be determined is what value, if any, should be given to the improvements on the Property based upon the differing uses proposed by the parties. Both appraisers agree that the value of the Property alone is approximately $77,500.00, and that the equipment in the chicken houses on the Property add no value. Debtor argues that the value to be placed upon the chicken houses and related improvements, and thus the Property as a whole, should be based upon Debtor's proposed disposition or use of the Property, as stated in 11 U.S.C. § 506. AgSouth contends that the highest and best use of the Property is to be converted into a broiler farm, and that reliance upon Debtor's

---

[3] Debtor indicated that he will rent the additional farm land needed for crop production.

[4] AgSouth's appraisal also provided figures based upon an income capitalization approach and a summation (cost) approach.

4

proposed use fails to reflect the Property's true replacement value cited by the United States Supreme Court in Associates Commercial Corporation v. Rash.[5] 520 U.S. 953, 963 (1997) ("replacement-value standard accurately gauges the debtor's "use" of the property."). AgSouth's appraiser values the improvements on the Property at $147,500.00.

The determination of the value of an allowed secured claim is governed by 11 U.S.C. § 506[6] of the Bankruptcy Code. Section 506 provides as follows:

> Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506.[7] In 1997, the United States Supreme Court in Rash addressed the method for valuing collateral pursuant to § 506. 520 U.S. 953. The Court rejected the use of a foreclosure value standard[8] in favor of replacement value, and defined replacement value as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." 520 U.S. at 960. The Court determined that the second sentence of § 506(a) addresses how value is determined, and that the "'proposed disposition or use' of the collateral is of paramount importance to the valuation question." Id. at 962.

---

[5] The Property was originally used as a breeder farm as opposed to a broiler farm.

[6] Further references to the Bankruptcy Code will be by section number unless otherwise indicated.

[7] In its entirety, Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . ."

[8] A foreclosure value standard takes into consideration the amount the creditor would realize upon foreclosure and sale of the collateral.

5

Although the statute plainly states, and the Court in Rash emphasized, that value is to be determined in light of the proposed disposition or use of such property, courts have not been uniform in the interpretation of the "proposed disposition or use" clause of § 506. There are two primary cases that have directly addressed the meaning of this clause – with opposite results. United States v. Donato (In re Donato), 253 B.R. 151 (M.D. Pa. 2000), and In re Bell, 304 B.R. 878 (Bankr. N.D. Ind. 2003).

In Donato, the issue before the court was the valuation of debtors' real property to determine the extent of the government's secured claim. The debtors presented expert testimony valuing the property in the manner in which the debtors intended to utilize their property, which in that case was to maintain the property together as one parcel. The government's position was that the property should be valued at its highest and best use regardless of the debtors' proposed use, and valued the property as if it were to be subdivided. Donato, 253 B.R. at 153-54. In examining the language of § 506 and the Supreme Court's analysis of § 506 in Rash, the court concluded that automatically applying the "'highest and best' use value to the real estate, without examining its proposed or intended use, is not proper." Id. at 155.

In the context of a Chapter 12 case, an Illinois bankruptcy court similarly concluded. In re Watkins, 240 B.R. 735 (Bankr. C.D. Ill. 1999). In Watkins, the court was presented with a competing appraisal by the mortgage holder that assumed a division of debtors' property that was not contemplated by the debtors. Instead, the debtors' current and prospective use was that of a family farm. The court determined that "[p]roperty retained for the debtor's use must be based upon replacement value (the cost of purchasing like property for the same use)," and concluded that valuation based upon debtors' intended use was the correct basis. Id. at 741.

6

The court in <u>Bell</u> reached a different result. 304 B.R. 878. The debtors in that case valued their property as it was presently being operated, as a farm, and argued that any valuation should be based on such proposed used. The creditor objected to such valuation. The court disagreed with the debtors, interpreting § 506 and the Supreme Court's reference in <u>Rash</u> to "proposed disposition or use" as referring to a debtor's two options for dealing with secured claims in that situation - surrender the collateral, or retain it and pay the creditor the collateral's present value. <u>Id.</u> at 881. In the end, the court in <u>Bell</u> did not reach a conclusion as to the appropriate value because the court found that neither appraisal represented the actual replacement value, but nonetheless refused to base the valuation upon debtors' intended use.[9] <u>See also</u> <u>In re Arden Properties, Inc.</u>, 248 B.R. 164 (Bankr. D. Ariz. 2000) (property with potential clean-up liability was to be valued in its present state and not based upon debtor's unique situation in which the debtor's negotiated settlement with the EPA would result in relief from the clean-up liability postconfirmation).

This Court has previously addressed whether to consider an appraisal that is inconsistent with the debtor's proposed use in <u>In re Pavilion Prop. Ltd.</u>, C/A No. 97-3186-B (Sept. 14, 1998). In <u>Pavilion</u>, the debtor's plan contemplated retrofitting the property at issue, apartment complexes, to repair defects in the buildings. The appraisal relied upon by the debtor valued the property assuming the apartments would not be repaired. The Court noted that <u>Rash</u> "holds that § 506(a) required that value reflect the proposed use of the Property by the Debtor under its Plan," and found that the debtor's appraisal that failed to consider the proposed use carried little, if any, probative weight. <u>See also</u> <u>In re Pack Enter.</u>, C/A No. 03-05020-W (Bankr. D.S.C. Sept. 12, 2003) (excluding appraisal on

---

[9] The court noted that the debtor's appraiser attributed no value to 17 acres of marshland based upon the property's use as a farm. The creditor's appraisal was not based upon sufficiently comparable properties. The court concluded that the value of the property was of some amount higher than that presented by the debtor and therefore denied confirmation.

a motion in limine that did not value poultry farm in accordance with debtors' proposed disposition or use of the property in the plan).

In applying § 506 and the analysis from <u>Rash</u> to the matter before the Court, the question is not *whether* the Court is to consider the debtor's proposed disposition or use of collateral - that is clear enough based upon the language of § 506. It is the meaning and extent of this phrase that the parties in this case dispute, and where courts such as in <u>Donato</u> and <u>Bell</u> have disagreed. In the matter before the Court, the only support provided by AgSouth for its proposition that this Court need not consider Debtor's proposed use of his Property as rural residential is based upon the analysis by the court in <u>Bell</u> - that proposed disposition or use means whether a debtor intends to retain or surrender the collateral. Accordingly, AgSouth argues that the highest and best use of the Property as a broiler farm is to control. Were the Court to accept AgSouth's argument, it appears that Debtor would be precluded from retaining the Property because the record shows that Gold Kist would not resume poultry operations with Debtor, and Debtor has no other ability to obtain a poultry integrator necessary for resumption of his operations.

The Court is convinced that consideration must be given to the actual use proposed by Debtor. The reasoning made by the court in <u>Bell</u> that consideration of a debtor's "proposed disposition or use" is solely based upon whether the debtor intends to surrender or retain the collateral appears excessively restrictive. The language of the statute clearly provides that valuation is to be considered "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506. The Supreme Court stated in <u>Rash</u> that "[s]ection 506(a) calls for the value the property possesses in light of the "'disposition or use' *in fact* 'proposed,' not the various dispositions or uses that *might* have been proposed." <u>Rash</u>, 520 U.S. at 964 (emphasis

8

added). This reference to "various dispositions or uses" implies a broader range of options than that of either retention or surrender of the collateral, as contemplated by the court in Bell. The Supreme Court's mandate that the consideration of the proposed use, and *not* the various dispositions or uses that *might* have been proposed, lends lesser credence to AgSouth's appraisal, which contemplates a speculative use not intended by Debtor.

If the Court were to accept the position of AgSouth, it would appear to give creditors a trump not intended by Congress. Based upon the relationship between Debtor and Gold Kist, it would be impossible for Debtor to commence a poultry operation. Gold Kist, as the only poultry integrator in the area, has made it clear that it will not do business with Debtor. Without an integrator, there would be no market for Debtor's poultry. Debtor would then find himself in a Catch 22 - he would be unable to retain the Property and unable to pay the present value of his Property based upon a completely different use for his Property (a broiler farm as proposed by AgSouth), but would also be foreclosed from operating the Property in such a fashion. Debtor testified that he does not have the funds to pay for such a conversion, and there was no evidence of any way in which Debtor could retain the Property under such valuation. Even if Debtor was able to convert his operations to a broiler facility, Gold Kist stated that it would not do business with Debtor.[10] Adopting the position of AgSouth would severely limit or eliminate the protections afforded Debtor by the Bankruptcy Code and give creditors in such instances excessive control over the outcome of a debtor's case.

The Court is not being presented with a situation where Debtor is being unreasonable, speculative, or capricious with respect to the proposed use for the Property, nor has any measure of

---

[10] The Court was also not presented with any testimony of a possibility of Debtor leasing his Property to a third party that could potentially obtain a contract with Gold Kist and generate an income stream.

9

bad faith been exhibited. Instead, Debtor is pursuing the limited options he has available to him in order to retain his Property. Implicit in the Bankruptcy Code is the opportunity to check and balance the valuation process. Abusive or bad faith efforts on the part of a debtor to manipulate the valuation process based upon a contrived proposed use can be controlled by, i.e., the plan confirmation process and the good faith corollary imposed for all reorganizing debtors. Debtor is the title owner of the Property, and has filed his Chapter 12 case in order to reorganize for the benefit of Debtor and for the benefit of his creditors.[11]    It appears more in line with the language of § 506 and the Supreme Court's emphasis upon the paramount importance of a debtor's proposed use to consider Debtor's intended use. 520 U.S. at 962.

The definition of "replacement value" provided by the Supreme Court in Rash is further instructive. Replacement value is defined as:

> the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition.

Rash, 520 U.S. at 959 n.2, 960.[12] In the first instance, the Court is to consider valuation from the perspective of a willing buyer in the *debtor's trade, business, or situation.* In addition, the benchmark for evaluating the property is that of comparable age and *condition.*

In the matter before the Court, AgSouth's appraisal at $225,000 contemplates converting the Property to a broiler farm and bases the value upon the "willingness of Goldkist to allow another

---

[11] Debtor's schedules indicate that there is a lien on his mobile home and that there are approximately $133,000 in nonpriority claims.

[12] The Supreme Court in Rash noted that a creditor is exposed to double risks of potential default and property deterioration when a debtor retains property, and found that replacement value "accurately gauges the debtor's 'use' of the property." 520 U.S. 962-63.

10

operator to set up a broiler operation in this facility and giving them a contract."[13] The appraisal also notes that income projections are based upon upgraded equipment being installed inside poultry houses to complete the conversion and that costs to upgrade may exceed $50,000. The remarks on the appraisal also indicate that bids for the conversion would be $49,000 per house for equipment and fixtures.[14] Furthermore, the comparable properties used appear to be that of broiler farms, and not properties that reflect the present condition or use proposed by Debtor.[15] Accordingly, even setting aside the issue of Debtor's proposed use, AgSouth's appraisal fails to fully consider the perspective of a willing buyer in Debtor's situation, fails to compare properties of like condition, and does not appear to reflect the Property's true replacement value.

The purpose of the valuation in this case it to value the Property for future plan confirmation purposes. It is clear from Debtor's testimony at the hearing and from a review of his Chapter 12 Plan that Debtor cannot utilize the real estate to conduct a poultry operation. He intends to use the Property for his residence, and to grow crops on a portion of the Property.

The appraisal submitted by Debtor is based on the use of the Property as rural residential. Such valuation is in conformity with Debtor's intended disposition and use for the Property.

---

[13]    Testimony was presented by Gold Kist that they would be willing to place flocks with a new owner. The Court was not convinced that such testimony is sufficient to overcome the deficiencies and contingencies in AgSouth's appraisal as set forth herein.

[14]    Following a hearing on this matter, the parties submitted memoranda on the proposed valuations. Based upon correspondence received from the parties, there appears to be some dispute about whether AgSouth's value of $147,500.00 is the value only after expending in excess of $100,000.00 to convert the chicken houses and purchase equipment. Counsel for AgSouth indicates that the figures are based upon "as is" values. Counsel for Debtor cites references in the appraisal, which are cited herein, that clearly indicate that the value is contingent upon costs expended for conversion as well as upon a contract being obtained by the operator from Gold Kist in order to continue operations. To the extent the value is based upon the improvements in their current condition, the Court is convinced that $147,500.00 is not the proper measure of the value of the improvements based upon the present condition and state of the buildings and related improvements as testified to by the parties.

[15]    The appraisal specifically states in the remarks that only broiler facility sales were used as value indicators.

11

Debtor's intended use does not appear unreasonable. The parties presented the Court with no other appraisals or figures, and indicated to the Court that their evidence was submitted in contemplation of a choice by the Court of one appraisal or the other. Accordingly, for the reasons stated herein, the Court accepts Debtor's appraisal of the Property in the amount of $77,500.00.

Therefore, it is

ORDERED that the claim of AgSouth with respect to the Property is secured in the amount of $77,500.00. The balance, if any, of AgSouth's claim is unsecured; and it is further

ORDERED that the claim of FSA with respect to the Property is wholly unsecured.

**AND IT IS SO ORDERED.**

_John E Waites_
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina,
_May 24_, 2005.